```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                           18-6127-MJ-HUNT
3

4
     UNITED STATES OF AMERICA,      )
5                                   )
                     PLAINTIFF,     )
6                                   )
              VS.                   )
7                                   )
     GUSTAVO ADOLFO YABRUDI,        )
8                                   )
                     DEFENDANT.     )
9    _____)
10                   (TRANSCRIPT BY DIGITAL RECORDING)

11

12           TRANSCRIPT OF PRETRIAL DETENTION AND REMOVAL HEARING

13   HAD BEFORE THE HONORABLE PATRICK M. HUNT, IN FORT LAUDERDALE,

14   BROWARD COUNTY, FLORIDA, ON APRIL 2, 2018, IN THE ABOVE-STYLED

15   MATTER.

16

17
     APPEARANCES:
18
     FOR THE GOVERNMENT:  SCOTT BEHNKE, A.U.S.A.
19                        500 EAST BROWARD BOULEVARD, 7TH FLOOR
                          FORT LAUDERDALE, FL 33301 - 954 660-5796
20
     FOR THE DEFENDANT:   LEONARDO E. CONCEPCION, ESQ.
21                        135 SAN LORENZO AVENUE, PENTHOUSE 830
                          CORAL GABLES, FL 33146 - 305 791-6529
22

23                    CARL SCHANZLEH, RPR - CM
                      CERTIFIED COURT REPORTER
24                     9960 SW 4TH STREET
                     PLANTATION, FLORIDA 33324
25                       954 424-6723
```

TABLE OF CONTENTS

WITNESSES:                    DIRECT   CROSS REDIRECT RECROSS

RALPH WOODS ..................... 15        18        37

1  (FORT LAUDERDALE, BROWARD COUNTY, FLORIDA;  APRIL 2, 2018, IN

2  OPEN COURT.)

3        THE CLERK:  UNITED STATES OF AMERICA VERSUS GUSTAVO

4  ADOLFO YABRUDI.

5        COUNSEL, PLEASE ANNOUNCE YOUR APPEARANCES FOR THE

6  RECORD.

7        MR. BEHNKE:  SCOTT BEHNKE ON BEHALF OF THE GOVERNMENT.

8        GOOD MORNING, YOUR HONOR.

9        THE COURT:  GOOD MORNING.

10        MR. CONCEPCION:  GOOD MORNING, YOUR HONOR.  LEONARDO

11  CONCEPCION ON BEHALF OF MR. YABRUDI, AND I'M SUBSTITUTING IN

12  FOR MR. MACEY WHO HAD PREVIOUSLY ENTERED AN APPEARANCE BUT HAD

13  CONFLICTS.

14        THE COURT:  OKAY.  AND IS THIS A PERMANENT APPEARANCE

15  FOR THIS DISTRICT?

16        MR. CONCEPCION:  IT'S A TEMPORARY APPEARANCE FOR

17  TODAY'S HEARINGS, YOUR HONOR.

18        THE COURT:  OKAY.  ARE WE GOING FORWARD WITH A

19  DETENTION AND REMOVAL HEARING?

20        MR. CONCEPCION:  YES, YOUR HONOR, WE CAN.

21        I JUST I JUST HAD ONE HOUSEKEEPING MATTER TO BRING UP

22  TO THE COURT TO SEE WHAT THE COURT HAD TO SAY ABOUT THAT, WHICH

23  IS THAT MR. YABRUDI IS ENTITLED TO A PRELIMINARY HEARING UNDER

24  RULE 5.1 AND IT HADN'T BEEN SET ON THE DOCKET.

25        SO I JUST WANTED TO KNOW IF WE WERE MOVING WITH THAT

1  ASPECT OF IT FOR TODAY OR IF THAT WAS BEING RESET FOR ANOTHER

2  DAY.  THE 14TH DAY FOR THAT HEARING IS TOMORROW THE 3RD.

3        THE COURT:  NO.  ORDINARILY -- I ASSUMED THAT THIS WAS

4  SET FOR A REMOVAL AND FOR A DETENTION HEARING TODAY, IS THAT

5  CORRECT --

6        THE CLERK:  YES, SIR.

7        THE COURT:  -- MR. BEHNKE?

8        THE CLERK:  THAT'S WHAT IT'S ON FOR.

9        MR. BEHNKE:  WE'RE PREPARED TO GO ON BOTH, YOUR HONOR.

10  I THINK I ASKED LAST WEEK WHETHER IT WOULD BE A REMOVAL HEARING

11  IF HE WAS CLAIMING HE ISN'T THE YABRUDI THAT'S IN THE

12  INDICTMENT AND I THINK THEY SAID -- BUT AGAIN THAT WOULD HAVE

13  BEEN WITH HIS PRIOR COUNSEL WHO IS NOT CAPABLE OF SPEAKING ON

14  HIS BEHALF.

15        SO, WE'RE PREPARED TO GO TODAY IF THEY WANTED IT.

16        THE COURT:  YES.  I MEAN, THAT'S PART OF A REMOVAL

17  HEARING IS IDENTITY.  SO IF THEY CAN'T PROVE THAT HE'S THE

18  RIGHT GUY THEN --

19        MR. BEHNKE:  RIGHT.

20        THE COURT:  -- HE WOULDN'T BE ORDERED REMOVED.

21        SO -- AND THERE IS A LOT OF OVERLAP BETWEEN A

22  DETENTION AND A REMOVAL HEARING SO WE WOULD BE GOING FORWARD

23  WITH BOTH.

24        FIRST LET ME ASK.  MR. YABRUDI, CAN YOU HEAR AND

25  UNDERSTAND ME OKAY THROUGH THE SERVICES OF THE INTERPRETER?

1        THE DEFENDANT:  YES, SIR.

2        THE COURT:  OKAY.  ALL RIGHT.

3        AND IF WE'RE GOING FORWARD.  MR. BEHNKE, AS YOU KNOW

4 YOU MAY PROCEED BY PROFFER AS LONG AS THERE IS A KNOWLEDGEABLE

5 AGENT PREPARED TO TESTIFY.

6        IF YOU WILL AS PART OF THE DETENTION HEARING LET ME

7 KNOW WHAT THE BASIS FOR THE REQUEST IS, WHETHER THERE IS A

8 PRESUMPTION AND ALSO IF YOU KNOW WHAT THE ESTIMATED GUIDELINES

9 WOULD BE.

10        MR. BEHNKE:  THANK YOU, YOUR HONOR.

11        I DON'T KNOW IF I CAN ANSWER ALL OF THOSE QUESTIONS

12 BUT I WILL TRY.

13        THE COURT:  DO YOUR BEST.

14        MR. BEHNKE:  THIS IS A MOTION -- THE REQUEST FOR

15 PRETRIAL DETENTION ON RISK OF FLIGHT.  I WOULD ALLEGE ECONOMIC

16 DAMAGE AS WELL.  BUT I DON'T KNOW IF THIS COURT ENTERTAINS

17 ECONOMIC DAMAGE.  IT'S BEEN UPHELD IN THE ELEVENTH CIRCUIT, AND

18 SO WE WOULD MAKE THE MOTION FOR BOTH, BOTH RISK OF FLIGHT AND

19 DANGER -- ECONOMIC DANGER.  WE DON'T THINK HE'S A PHYSICAL

20 DANGER TO ANYBODY, AT LEAST NOT AT THIS POINT.

21        MR. YABRUDI COMES TO US BY WAY OF COMPLAINT UNDER THE

22 EASTERN DISTRICT OF TEXAS DATED MARCH OF 2018 CHARGING

23 CONSPIRACY TO COMMIT MONEY LAUNDERING IN VIOLATION OF 18, USC,

24 1956(H), THAT IS A CHARGE THAT CARRIES A MAXIMUM SENTENCE OF 20

25 YEARS AND A FINE OF 500,000 OR TWICE THE VALUE OF THE PROPERTY

1  LAUNDERED.

2  THE COMPLAINT ALLEGES APPROXIMATELY $67,000 IN

3  LAUNDERED MONIES.  I WILL INDICATE TO THE COURT ON THE 2S AND

4  2B1 THAT'S A PLUS SIX.  HOWEVER, I WILL TELL THE COURT I'VE

5  BEEN ADVISED BY THE AUSA OUT OF THE EASTERN DISTRICT OF TEXAS

6  THAT SHE IS PREPARING AN INDICTMENT WHICH INCLUDES 3.5 -- IN

7  EXCESS OF 3.5 MILLION DOLLARS IN EXCESS OR IN LAUNDERED MONEY,

8  AND THEREFORE IT WOULD BE A PLUS 18.

9  I BELIEVE IT STARTS TODAY YOU GOT PLUS SIX FOR

10 PROCEEDS OF A DRUG TRAFFICKING PLUS FOUR FOR BEING IN THE

11 BUSINESS OF LAUNDERING FUNDS, NO LEGITIMATE BUSINESS INCOME OR

12 OTHER LAUNDERED MONEY.  YOU HAVE A PLUS TWO FOR SOPHISTICATED

13 MEANS.  MULTIPLE LAYERS WERE USED IN THIS ISSUE INCLUDING THIRD

14 PARTIES BASED ON A TRADE BASED MONEY LAUNDERING SCHEME.  FOR A

15 TOTAL OF 38, THAT'S AT 235 TO 293.  WITH A 20 YEAR CAP THE

16 DEFENDANT IS LOOKING AT A MAXIMUM SENTENCE OF 240 MONTHS.

17 THE COURT:  OKAY.

18 MR. BEHNKE:  THE DEFENDANT HAS DUAL CITIZENSHIP.  HE

19 IS A CITIZEN OF THE U.S. AND A CITIZEN OF VENEZUELA.  OBVIOUSLY

20 IF HE -- IF HE AVAILS HIMSELF OF AN OPPORTUNITY TO GO TO

21 VENEZUELA WE WILL NOT HAVE ACCESS TO HIM IN VENEZUELA.

22 THE COURT:  IS THERE AN EXTRADITION TREATY BETWEEN

23 U.S. AND VENEZUELA?

24 MR. BEHNKE:  I DON'T BELIEVE SO, NO.

25 THE COURT:  OKAY.

1            MR. BEHNKE:  MR. YABRUDI IS A FORMER COOPERATING

2  SOURCE OF INFORMATION WITH DEA.  HE WAS A COOPERATING INFORMANT

3  FOR DEA IN NOVEMBER OF -- FROM NOVEMBER 4TH OF 2010 TO MAY 1ST

4  OF 2012.  HE WAS A COOPERATING SOURCE OF INFORMATION FROM

5  NOVEMBER 1OTH, 2011, TO JUNE 28TH OF 2012 IN NEW YORK.

6            HE ALSO WORKED FOR DEA MONEY LAUNDERING UNIT IN

7  BOSTON.  THAT FROM 12-9-1022, HE WAS DEACTIVATED IN MAY --

8  EXCUSE ME, IN MARCH 6TH OF 2013, AND HE WAS REACTIVATED IN MAY

9  OF 2012 FOR MIAMI -- THAT WAS IN BOSTON, BY THE WAY -- AND

10  DEACTIVATED ON JANUARY 8TH OF 2013.  HE WAS DEACTIVATED AS

11  UNSATISFACTORY AND FOR ENGAGING IN UNAUTHORIZED MONEY

12  MOVEMENTS.  HE WAS ACTIVE WITH BOSTON FROM TWO THOUSAND -- FROM

13  DECEMBER OF 2014 THROUGH JUNE 30TH OF 2016.

14            FOR ALL PURPOSES IN WHICH HE WAS A COOPERATING SOURCE

15  FOR DEA HE WAS A MONEY DELIVERER OR PICKER UP.  HE PICKED UP

16  MONEY.  SO WHEN HE WAS WORKING FOR DEA IN THEIR UNDERCOVER

17  OPERATION HE WAS WORKING IN ONLY THAT CAPACITY AND NEVER IN THE

18  CAPACITY FOR WIRE TRANSACTIONS.  THAT'S A LAYER ABOVE

19  ELEVATION.

20            AS I STAND HERE TODAY, JUDGE, I HAVE TRIED TO

21  UNDERSTAND TRADE BASED MONEY LAUNDERING, AND I KIND OF HAVE AN

22  IDEA BUT IF THE COURT HAS FURTHER QUESTIONS CONCERNING THAT

23  TYPE OF MONEY LAUNDERING TRANSACTION MY WITNESS IS AN EXPERT IN

24  THAT AND HE CAN ADVISE THE COURT CONCERNING THAT.

25            I WILL TELL THE COURT IT'S MY UNDERSTANDING THAT

1 MR. YABRUDI, AND THE NATURE OF THE CHARGES AGAINST MR. YABRUDI

2 IN THE EASTERN DISTRICT INVOLVED A MR. MALOOF.  MR. MALOOF IS

3 ALSO THE OWNER OF A CELLPHONE DISTRIBUTOR, A CELLPHONE COMPANY.

4 MR. YABRUDI SENDS THOSE CELLPHONES IN LARGE NUMBERS TO

5 COLOMBIA.  AND MY UNDERSTANDING, VERY BASIC UNDERSTANDING OF

6 TRADE BASED MONEY LAUNDERING IS THAT WE SEND MERCHANDISE -- OR

7 MR. MALOOF WOULD SEND MERCHANDISE TO COLOMBIA AND HE WOULD SEND

8 AN X AMOUNT OF DOLLARS.  LET'S SAY IT'S $300,000 WORTH OF

9 CELLPHONES.

10 THEY WOULD SEND BACK PAYMENT IN MONEY THAT WAS

11 TRANSFERRED -- THEY WOULD TAKE THE MONEY, THE 300,000, THEY

12 WOULD MAKE PESOS OUT OF THAT AND THEN THEY WOULD RENEGOTIATE IT

13 AGAIN, PLUS THEY WOULD SEND MORE MONEY BACK AND OFTEN THROUGH

14 THIRD PARTIES.  SO THERE WAS A THIRD PARTY CHANGING HANDS TO

15 PAY HIM FOR THOSE CELLPHONES AND IT WAS CLEARLY IN EXCESS OF

16 THE VALUE OF THE CELLPHONES.

17 SO THEY WERE RECEIVING -- I GUESS COLOMBIA WAS

18 RECEIVING MORE MONEY OR MORE VALUE THAN WE WERE GETTING BACK

19 HERE AS WE WERE PAYING -- OR THEY WERE PAYING THE DRUG DEALERS.

20 WE KNOW THAT HE WAS PAYING DRUG DEALERS BECAUSE WE

21 DEBRIEFED MR. MALOOF, AND MR. MALOOF ADMITTED THAT YABRUDI TOLD

22 HIM THAT HE WAS DEALING WITH DRUG DEALERS.  AND WE KNOW THE

23 TYPE OF FUNCTION THAT MR. YABRUDI SERVED WAS TO ENGAGE IN THE

24 WIRE TRANSFERS, A FUNCTION HE DID NOT HAVE ANY RESPONSIBILITY

25 TO DO AS A PAID INFORMANT.

1           THE MONEY THAT I'VE CITED TO THE COURT ARE CLEARLY

2   ACTIONS THAT WERE OUTSIDE THE SCOPE.  MOST OF THEM OCCURRED

3   AFTER 2016, JUNE OF 2016, IN WHICH MR. YABRUDI WAS DEACTIVATED

4   COMPLETELY AND WORKED FOR NOBODY.  AND MR. YABRUDI -- AND ALL

5   OF THEM ENGAGED IN THE WIRE TRANSFER OF MONIES FOR -- THROUGH

6   MR. MALOOF, WITH MR. MALOOF'S OPERATION.

7           WHEN HE LEARNED, THAT IS HE FIRST OF ALL, THAT IS

8   MR. YABRUDI FINGERED MR. MALOOF WHEN HE WAS -- WHEN HE WAS

9   APPROACHED AND THE GOVERNMENT KNEW THAT HE WAS DOING SOMETHING

10  WITH MR. MALOOF.  AND HE IMPLICATED MR. MALOOF IN AN ATTEMPT

11  EXCULPATE HIMSELF.

12          AND MR. MALOOF -- BUT HE TOLD MR. MALOOF THAT DEA WAS

13  ON TO HIM AND THAT ALL HE HAD TO DO WAS CHANGE HIS BANK

14  ACCOUNTS, WHICH HE DID, AND THEY WOULD NOT BE ABLE TO TRACE THE

15  MONEY.  SO HE WAS WORKING BOTH SIDES OF THE COIN.

16          OBVIOUSLY EVERYTHING HE DID WITH MR. MALOOF OFF -- ON

17  2016, AND EVERYTHING PRIOR TO TWO 2016 WAS OFF THE BOOKS,

18  MEANING IT WAS NOT REGISTERED WITH DEA, IT WAS NOT MONITORED BY

19  DEA, IT CLEARLY DID NOT INVOLVE ANY DEA OPERATION.  MR. MALOOF

20  TESTIFIED THAT -- OR INDICATED TO AGENTS THAT HE KNEW THIS WAS

21  ILLEGAL NARCOTICS TRAFFICKING BECAUSE HE WAS TOLD THAT BY

22  MR. YABRUDI.

23          MR. YABRUDI HAS FREQUENT TRAVEL.  HE TRAVELS -- HE

24  TRAVELS TO COLOMBIA WITH REGULARITY.  HE TRAVELS TO ALL THE

25  DOMINICAN, REPUBLIC, HE TRAVELS TO ECUADOR -- I BELIEVE ECUADOR

1  IS ON THAT LIST, IS THAT CORRECT?

2           A VOICE:  NO.  NO.  PANAMA.

3           MR. BEHNKE:  PANAMA.

4           HE TRAVELS TO -- HE TRAVELS TO THOSE LOCATIONS TO MEET

5  WITH NARCOTIC TRAFFICKERS AND OTHER INDIVIDUALS.  THOSE ARE ALL

6  LOCATIONS KNOWN TO THE DEA TO BE PLACES WHERE COLOMBIANS CAN

7  TRAVEL FREELY AND THEY DO FREQUENTLY TO ENGAGE IN NEGOTIATIONS

8  FOR DRUG TRANSACTIONS.

9           THE DEFENDANT HAS A RESIDENCE IN PANAMA.  HE HAS A --

10  I GUESS HE RENTS A TOWNHOME NOT IN HIS NAME BUT IN THE NAME OF

11  HIS WIFE, MARIA JADER, WHO BY THE WAY IS IMPLICATED IN THE

12  INVESTIGATION AS BEING COMPLICIT WITH MR. YABRUDI, AND

13  ASSISTING HIM BY PERFORMING CERTAIN BANK FUNCTIONS AND OTHER

14  WIRE TRANSFERS KNOWN TO THE DEA.  SHE HAS NOT BEEN INDICTED AT

15  THIS POINT BUT SHE HAS BEEN IMPLICATED AND THEY'RE PURSUING

16  THAT LEAD.

17           AS I SAID, HE CURRENTLY LIVES IN A TOWNHOME.  THAT'S

18  WHERE HE SUPPOSEDLY ALSO OWNS A BUSINESS CALLED FLOHAMMER.

19  THAT BUSINESS HAS BEEN LOOKED AT BY DEA.  THERE ARE VERY LITTLE

20  OR FEW BUSINESS ACCOUNTS, VERY LITTLE ACTIVITY ON THOSE

21  BUSINESS ACCOUNTS.  ONE RECEIPT FOUND IN THE RESIDENCE WAS FOR

22  CONSTRUCTION OF LESS THAN $1,000 USING ANOTHER MAN'S CREDIT

23  CARD.

24           A REVIEW OF THE BANK STATEMENTS FOR THE CONSTRUCTION

25  BUSINESS FOUND AT HIS HOME REVEALED ONLY PERSONAL EXPENDITURES

1  OR GROCERIES, CONVENIENT STORES AND THOSE TYPES OF THINGS.

2  CASH DEPOSITS IN THREE THOUSAND TO FIVE THOUSAND WERE ONLY

3  NOTES.  NO BUSINESS RELATED ACTIVITY WAS FOUND, NO CONTRIBUTION

4  EQUIPMENT, WHICH I'M NOT REALLY SURE WHAT CONTRIBUTION

5  EQUIPMENT IS.

6           A VOICE:  CONSTRUCTION.

7           MR. BEHNKE:  EXCUSE.  CONSTRUCTION EQUIPMENT.  SORRY.

8           NO CONSTRUCTION EQUIPMENT WAS FOUND AT THE HOUSE

9  EITHER.  AFTER TWELVE DIFFERENT APPEARED TO HAVE BEEN RECEIVED

10 MAIL AT THIS LOCATION IN THE LAST COUPLE OF YEARS.  HE'S HAD --

11 HE'S HAD THE RESIDENCE SINCE 2012.

12          HE HAS NO PERSONAL BANK ACCOUNTS.  HE HAS BEEN IN

13 MIAMI AT THE EARLIEST SINCE 2004, BUT AS I STATED FROM THE

14 RECORD CONCERNING HIS INVOLVEMENT WITH THE OTHERS AS

15 COOPERATING SOURCES MY GUESS IS HE TRAVELED FREELY TO BOSTON,

16 HE HAS TRAVELED FREELY TO -- BACK TO MIAMI AND OTHER PLACES.

17          CAN I HAVE A SECOND, JUDGE?

18          I HAVE MISSTATED THAT THE TOWNHOME IS IN HIS WIFE'S

19 NAME.  IT'S ACTUALLY IN HIS GIRLFRIEND'S NAME.

20          THE COURT:  OKAY.

21          MR. BEHNKE:  I DON'T KNOW IF THE GIRLFRIEND IS

22 IMPLICATED BUT THE WIFE IS, CORRECT?

23          A VOICE:  BOTH.

24          MR. BEHNKE:  BOTH ARE IMPLICATED.

25          THE COURT:  I WANT TO MAKE SURE I UNDERSTAND THE

 1  ALLEGED MONEY LAUNDERING.

 2           HE IS SENDING CELLPHONES TO COLOMBIA --

 3           MR. BEHNKE:  MALOOF IS.

 4           THE COURT:  MALOOF IS.

 5           MR. BEHNKE:  WHO WAS A CO-CONSPIRATOR IN THAT MONEY

 6  LAUNDERING SCAM.

 7           THE COURT:  AND THEN PEOPLE -- ALLEGED DRUG DEALERS IN

 8  COLOMBIA ARE OVERPAYING FOR THE CELLPHONES AND THAT MONEY COMES

 9  BACK TO THE UNITED STATES AND IT'S THE OVERPAYMENT THAT IS THE

10  MONEY LAUNDERING?

11           MR. BEHNKE:  NO.  I MISSTATED THAT WHEN I FIRST SAID

12  THAT.  OKAY?

13           OBVIOUSLY IF WE'RE PAYING FOR THE DRUGS, WE'RE THE

14  CONSUMER NATION, MORE MONEY HAS GOT TO BE GOING BACK TO THE

15  DRUG DEALERS IN COLOMBIA.  THAT'S WHAT'S HAPPENING.

16           SO HE'S GETTING VALUE FOR WHAT HE'S GOT PLUS -- I'M

17  TALKING ABOUT MALOOF, NOW.  HE'S GETTING VALUE PLUS A LITTLE

18  BIT EXTRA, OKAY, FOR THE CELLPHONES.  HE GETS SOMETHING ON TOP

19  OF THAT, MEANING MR. MALOOF.

20           BUT THE MONEY THAT'S BEING TRANSFERRED TO COLOMBIA IS

21  FAR IN EXCESS OF THE VALUE BUT IT'S BEING DONE THROUGH A

22  CONDUIT OF DIFFERENT INDIVIDUALS WHO ARE PAYING FOR IT TO MAKE

23  IT DIFFICULT TO BE EXPOSED BY GOVERNMENT.  OKAY?  TO GET

24  DECIPHERED BY THE GOVERNMENT, THAT IS THE GOVERNMENT OF THE

25  UNITED STATES, IN ORDER TO MAKE SURE THEY GET PAID.

 1          IT'S ACTUALLY MORE LUCRATIVE THAN TRADITIONAL FORMS OF

 2  MONEY LAUNDERING WHICH THEY'RE CARRYING HUGE SUITCASES BACK

 3  IN -- YOU KNOW, IT'S A MUCH MORE FINANCIALLY BENEFICIAL OR ALL

 4  PARTIES INVOLVED THAN THE ORIGINAL FORM OF MONEY LAUNDERING.

 5          THE COURT:  BUT DRUGS ARE BEING SOLD IN THE UNITED

 6  STATES, MONEY PROCEEDS FROM THE SALE OF DRUGS ARE BEING USED TO

 7  PURCHASE CELLPHONES OR JUST --

 8          MR. BEHNKE:  NO.

 9          (BOTH TALKING AT THE SAME TIME)

10          THE COURT:  -- NOT BEING WIRE TRANSFERRED TO COLOMBIA?

11          MR. BEHNKE:  THEY'RE ACTING AS IF THEY'RE BEING USED

12  BUT THEY'RE GETTING PAID AS AN EXCUSE TO PAY FOR THOSE

13  CELLPHONES, BUT IN ACTUALITY THEY'RE BEING PAID FOR THE

14  CELLPHONES PLUS THE DRUGS THAT WERE BEING SENT.  AND IT GOES

15  THROUGH SO MANY HANDS THAT IT'S HARD TO NAIL DOWN THE --

16          THE COURT:  SO --

17          (BOTH TALKING AT THE SAME TIME)

18          THE COURT:  -- ARE GOING FROM U.S. TO COLOMBIA OR THE

19  OTHER WAY AROUND?

20          MR. BEHNKE:  CELLPHONES ARE GOING FROM THE U.S. TO

21  COLOMBIA.  AND THEY ARE VALUABLE IN COLOMBIA.  THERE IS A

22  MARKET FOR CELLPHONES.  SO THAT WAS A LEGITIMATE BUSINESS, THE

23  CELLPHONE BUSINESS.

24          MR. MALOOF HAS PLED GUILTY BY THE WAY TO CHARGES

25  RELATED TO THIS AND IS AWAITING SUBMISSION TO -- HE'S AWAITING

1  DESIGNATION BEFORE HE TURNS HIMSELF IN.  I THINK HE'S OUT ON

2  BOND.

3       THE COURT:  OKAY.  NAIL DOWN THE MONEY LAUNDERING FOR

4  ME.

5       DRUGS ARE SOLD IN THE UNITED STATES.  PRESUMABLY CASH

6  IS BEING PAID FOR THE DRUGS.  WHERE IS THE MONEY LAUNDERING?

7       MR. BEHNKE:  OKAY.  I'M GOING TO LET THE WITNESS

8  EXPLAIN THAT BECAUSE HE'S AN EXPERT IN IT, JUDGE.  AND I'VE

9  TRIED TO UNDERSTAND IT TO MAKE IT CLEAR FOR ME WHICH IS STILL

10 CLEAR AS MUD, BUT IT'S -- I KIND OF GET THE IDEA.

11      THE COURT:  ALL RIGHT.  WHY DON'T YOU CALL THE AGENT.

12 I THINK YOU'RE GOING TO HAVE TO CALL THE AGENT ANYWAY FOR

13 DIRECT TESTIMONY AS FAR AS IDENTITY --

14      MR. BEHNKE:  YES.

15      THE COURT:  -- SO WHY DON'T YOU CALL YOUR AGENT.

16      MR. BEHNKE:  THE GOVERNMENT CALLS RALPH WOODS.

17      THE COURT:  RALPH WOODS?  OKAY.

18      THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

19      (WITNESS SWORN)

20      THE WITNESS:  YES.

21      THE CLERK:  PLEASE BE SEATED.

22      STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE

23 RECORD AND THE AGENCY THAT YOU WORK FOR.

24      THE WITNESS:  RALPH WOODS, W-O-O-D-S, CURRENTLY AS A

25 TASK FORCE OFFICER FOR THE DEA, DALLAS.

```
 1          THE COURT:  OKAY.  MR. BEHNKE?

 2                    RALPH WOODS,

 3  BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

 4                  DIRECT EXAMINATION

 5  BY MR. BEHNKE:

 6  Q.  FIRST OF ALL, DO YOU RECOGNIZE MR. YABRUDI?

 7  A.  YES, SIR, I DO.

 8  Q.  HAVE YOU PERSONALLY MET HIM?

 9  A.  YES, SIR, I HAVE.

10  Q.  ARE YOU ASSOCIATED WITH THE PROSECUTION OF MR. YABRUDI OUT

11  OF THE EASTERN DISTRICT OF TEXAS?

12  A.  YES, SIR.

13  Q.  ARE YOU FAMILIAR WITH THE AUSA WHO IS HANDLING THAT CASE?

14  A.  YES, SIR, I AM.

15  Q.  AND WHO IS THAT?

16  A.  LESLIE BROOKS.

17  Q.  ALL RIGHT.  HAVE YOU INTERVIEWED MR. YABRUDI AS A DEA AGENT

18  CONCERNING MATTERS RELATED TO THIS INVESTIGATION?

19  A.  I HAVE INTERVIEWED HIM NOT AS AN AGENT.  I HAVE INTERVIEWED

20  HIM IN MATTERS CONCERNING THIS PARTICULAR INVESTIGATION THOUGH.

21  Q.  ALL RIGHT.  DO YOU SEE MR. YABRUDI IN THIS COURTROOM?

22  A.  I DO.

23  Q.  IS HE INDEED -- CAN YOU IDENTIFY HIM FOR THE COURT, PLEASE?

24  A.  YES.  HE IS SITTING AT THE DEFENDANT'S TABLE ON THE LEFT.

25          MR. BEHNKE:  LET THE RECORD REFLECT THE WITNESS HAS
```

1   IDENTIFIED THE DEFENDANT, MR. YABRUDI.

2          THE COURT:  YES, SIR.

3   BY MR. BEHNKE:

4   Q.  HE IS ONE IN THE SAME WITH THE MR. YABRUDI WHO IS THE

5   SUBJECT OF THE INVESTIGATION AND THE COMPLAINT THAT'S BROUGHT

6   BEFORE THIS COURT THIS MORNING?

7   A.  YES, SIR.

8   Q.  ARE YOU FAMILIAR WITH THE DETAILS OF THE INDICTMENT OR AT

9   LEAST THE INTENT OF THE INDICTMENT TO ALLEGE ADDITIONAL

10  PAYMENTS AS THEY WERE ANNOUNCED TO THE COURT?

11  A.  YES, SIR.

12  Q.  AND THOSE ARE MONEY LAUNDERING PROCEEDS, IS THAT CORRECT?

13  A.  YES, SIR.

14  Q.  ALL RIGHT.  WOULD YOU EXPLAIN FOR THE COURT, AS WELL AS YOU

15  CAN, THE TRADE BASED MONEY LAUNDERING SCHEME THAT WAS BEING

16  PERPETRATED BY MR. YABRUDI AND OTHERS.

17  A.  OKAY.  THIS IS A -- IT'S TYPICALLY CALLED A TRADE BASED

18  MONEY LAUNDERING.

19          AND BASICALLY YOU HAVE NARCOTICS PROCEEDS SITTING IN

20  VARIOUS U.S. CITIES AFTER THEY HAVE SOLD THE NARCOTICS.  IT IS

21  ARRANGED THROUGH A THIRD PARTY FROM THE NARCOTIC TRAFFICKERS IN

22  THIS CASE IN COLOMBIA.  THEY WANT THEIR MONEY BACK.  SO THEY

23  ARRANGE FOR A THIRD PARTY TO GO PICK UP THE MONEY AND PUT IT

24  INTO A BANK ACCOUNT.

25          THE COURT:  OKAY.

 1          THE WITNESS:  ONCE THAT MONEY IS IN A BANK ACCOUNT, IN

 2  THIS CASE -- AND THAT'S WHAT MR. YABRUDI DID FOR THE DEA.  HE

 3  WAS WHAT WE CALL THE MONEY BROKER.

 4          HE WOULD ARRANGE FOR MONEY PICK-UPS OUTSIDE OF THE

 5  U.S. INTERNATIONALLY AND -- SPAIN, VARIOUS COUNTRIES.  HE WOULD

 6  ARRANGE FOR MONEY PICK-UPS IN THOSE COUNTRIES FROM NARCOTICS

 7  PROCEEDS.

 8          IN THIS PARTICULAR CASE HE ACTED AS A WIRE BROKER

 9  OUTSIDE OF THE DEA WHERE HE WOULD -- ONCE THE MONEY IS IN THE

10  BANK ACCOUNT HE WOULD TAKE THE EQUIVALENT -- IN THIS ONE

11  TRANSACTION IT WAS $67,900.  HE WOULD TAKE COLOMBIAN PESOS IN

12  THE EQUIVALENT OF $67,900 AND PAY OFF THE NARCOTICS TRAFFICKER

13  IN COLOMBIA.

14          SO NOW THE NARCOTICS TRAFFICKER IS SATISFIED.  THEY

15  HAVE THEIR MONEY.  SO HE WILL TAKE THE MONEY NOW -- LET'S SAY

16  IN HIS BANK ACCOUNT.  HE HAS TO DO SOMETHING WITH IT TO MAKE IT

17  APPEAR CLEAN AND TO BE ABLE TO UTILIZE IT IN FUTURE MONEY

18  LAUNDERING OPERATIONS.

19          SO HE'LL TAKE THAT MONEY, GIVE IT TO MALOOF.  MALOOF

20  WILL USE THAT AS CAPITAL TO BUY CELLPHONES.  THOSE PHONES WOULD

21  BE SHIPPED TO COLOMBIA, SOLD AT A PROFIT.  THEY WILL SPLIT THE

22  PROFIT.  NOW THEY HAVE COLOMBIAN PESOS TO PAY FOR THE NEXT

23  TRANSACTION PLUS THEIR PROFIT.

24          THAT'S TYPICALLY HOW TRADE BASE MONEY LAUNDERING

25  OPERATES BECAUSE IT'S MUCH BETTER THAN BLACK-MARKET PESO

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | EXCHANGE IN THE FACT THAT THEY LOSE MORE PERCENTAGE THAT WAY        |
| 2  | OFF OF THE REGULAR EXCHANGE THAT LEGITIMATE PEOPLE DO.  IN THIS     |
| 3  | CASE THEY MAKE A PROFIT OFF OF IT.                                  |
| 4  | THE COURT:  AND IT'S ESTIMATED THAT THE ENTIRE                      |
| 5  | INDICTMENT IS GOING TO INVOLVE THREE AND A HALF MILLION DOLLARS     |
| 6  | WORTH OF --                                                         |
| 7  | THE WITNESS:  YES, SIR.                                             |
| 8  | THE COURT:  AND THIS IS SIMILAR TO WHAT HE WAS DOING               |
| 9  | WITH THE DEA BEFORE HE WAS DEACTIVATED?                             |
| 10 | THE WITNESS:  NO.  WITH DEA HE WAS DOING THE FIRST                 |
| 11 | PART OF IT.  HE WAS DOING MONEY PICK-UPS.  HE WOULD ARRANGE FOR     |
| 12 | UNDERCOVER OFFICERS TO PICK UP MONEY AND -- INTERNATIONALLY.        |
| 13 | THEN ONCE IT WAS IN THE SYSTEM HE WAS TYPICALLY DONE WITH IT AT     |
| 14 | THAT STAGE FOR US.  BUT WITH MALOOF HE WAS COORDINATING THE         |
| 15 | WIRE BROKERING SIDE OF IT.                                          |
| 16 | THE COURT:  OKAY.                                                   |
| 17 | DOES THAT CONCLUDE YOUR DIRECT?                                     |
| 18 | MR. BEHNKE:  YES, YOUR HONOR.                                       |
| 19 | THE COURT:  WOULD YOU LIKE TO CROSS?                               |
| 20 | MR. CONCEPCION:  YES, SIR.                                          |
| 21 | CROSS EXAMINATION                                                   |
| 22 | BY MR. CONCEPCION:                                                  |
| 23 | Q.  GOOD MORNING, AGENT WOODS.                                      |
| 24 | A.  GOOD MORNING, SIR.                                              |
| 25 | Q.  HOW ARE YOU DOING?                                              |

1   A.   VERY GOOD.   I'M A TASK FORCE OFFICER BUT I APPRECIATE IT.

2   Q.   OKAY.   JUST SO I UNDERSTAND THE MONEY LAUNDERING THAT YOU

3   WERE TALKING ABOUT.

4   A.   YES?

5   Q.   WHAT YOU'RE SAYING IS THERE IS MONEY IN A U.S. CITY,

6   NEW YORK FOR EXAMPLE --

7   A.   RIGHT.

8   Q.   -- AND THAT MONEY IS PICKED UP IN A SITUATION LIKE THIS BY

9   A DEA UNDERCOVER OR INFORMANT.

10  A.   TRUE.   SOMETIMES, YES.

11  Q.   AND THAT MONEY THEN DOES WHAT; IT GOES INTO A DEA ACCOUNT,

12  RIGHT?

13  A.   AN UNDERCOVER ACCOUNT.

14  Q.   RIGHT.   SO FROM THAT UNDERCOVER DEA ACCOUNT IT'S THEN

15  TRANSFERRED OVER TO A RETAILER, SOMEONE LIKE MALOOF, CORRECT?

16  A.   CORRECT.

17  Q.   AND WHO DIRECTS THE DEA TO TRANSFER THE MONEY FROM THAT

18  UNDERCOVER ACCOUNT TO A RETAILER?

19  A.   YEAH.   LIKE MR. YABRUDI AS A WIRE BROKER.

20  Q.   OKAY.   SO FROM THERE THAT MONEY IS USED TO BUY SOME KIND OF

21  MERCHANDISE CELLPHONES --

22  A.   RIGHT.   IT'S NOT ALWAYS CELLPHONES.   IT COULD BE --

23  Q.   RIGHT.

24  A.   -- ANYTHING, RIGHT.

25  Q.   AND THEN THE PEOPLE IN COLOMBIA ARE PAID, AND THEN

1  EVENTUALLY THOSE GOODS MAKE THEIR WAY TO COLOMBIA, ARE SOLD AND

2  THEN EVERYONE RECOUPS THEIR MONEY --

3  A.   RIGHT.

4  Q.   -- RIGHT?

5       NOW, IN THIS PROCESS A GROUP LIKE YOURS, YOU WORK WITH

6  OTHER DEA OFFICERS AROUND THE COUNTRY, RIGHT?

7  A.   AROUND THE WORLD, YES.

8  Q.   RIGHT.  AND YOU ALSO WORK WITH INFORMANTS AND UNDERCOVERS

9  AS WELL, RIGHT?

10  A.   RIGHT.

11  Q.   NOW THESE UNDERCOVERS AND INFORMANTS, THEY ARE NOT

12  ADVERTISING TO THE PEOPLE THEY DEAL WITH LIKE RETAILERS THAT

13  THEY WORK FOR THE DEA, CORRECT?

14  A.   NOT USUALLY.

15  Q.   RIGHT.  YOU WOULD HOPE NOT.

16  A.   RIGHT.

17  Q.   SO IN THIS SITUATION THE MONEY WAS PICKED UP WHERE, WAS IT

18  NEW YORK?

19  A.   IN THIS PARTICULAR SITUATION?

20  Q.   YES, SIR?

21  A.   I BELIEVE SO, YES.

22  Q.   OKAY.  SO WHO DIRECTED THE DEA, YOUR GROUP, TO PICK UP THAT

23  MONEY IN NEW YORK?

24  A.   I COULD NOT TELL YOU.  I DON'T KNOW.  THAT WAS NOT PART OF

25  MY INVESTIGATION.

1  Q.  ALL RIGHT.  SO AS WE STAND HERE RIGHT NOW WE DON'T HAVE ANY

2  EVIDENCE THAT MR. YABRUDI DIRECTED THAT PICK UP.

3  A.  NO.

4  Q.  OKAY.  SO YOU GOT THAT MONEY, IT'S PICKED UP FROM

5  NEW YORK --

6  A.  AH-HUH.

7  Q.  -- AND NOW SOMEONE LET'S YOU KNOW, HEY, TRANSFER IT TO

8  MALOOF WHOSE COMPANY WAS CELL NETWORK, RIGHT?

9  A.  RIGHT.

10  Q.  AND WE DON'T HAVE ANY EVIDENCE AS WE SIT HERE TODAY THAT

11  MR. YABRUDI MADE THAT DIRECTION, RIGHT?

12  A.  NOT IN FRONT OF US RIGHT HERE.  BUT, YES, WE HAD THE

13  FINANCIALS.  WE HAVE THE MESSAGING AND ALL THAT, YES.

14  Q.  ALL RIGHT.  SO YOU SAID THE --

15  A.  WE HAD --

16          (BOTH TALKING AT THE SAME)

17  Q.  -- MESSAGING --

18  A.  -- SUPPORTING DOCUMENTATION IF THAT'S WHAT YOU'RE ASKING.

19  Q.  OKAY.  BUT THAT'S NOT INCLUDED IN THE AFFIDAVIT OR ANYTHING

20  WE'RE SEEING HERE TODAY.

21  A.  IN THE PROBABLE CAUSE STATEMENT?  NO.

22  Q.  OKAY.  SO NOW YOU SAID TEXT MESSAGES.  THESE TEXT MESSAGES

23  CAME FROM MALOOF, RIGHT?

24  A.  (UNINTELLIGIBLE) YES.

25  Q.  YES.

1   A.   YES.

2   Q.   SO THESE TEXT MESSAGES STATE EXACTLY WHAT, THAT MR. YABRUDI

3   LET HIM KNOW, HEY, BE ON THE LOOKOUT FOR THIS WIRE?

4   A.   IN ESSENCE.

5   Q.   OKAY.  ALL RIGHT.  AND THIS IS WHERE I GUESS I STRUGGLE A

6   LITTLE BIT.

7   A.   OKAY.

8   Q.   WHY IS IT THAT HIM HAVING -- MR. YABRUDI HAVING THAT

9   INFORMATION IS INCRIMINATING TO HIM IN THIS SITUATION?

10  A.   I'M NOT FOLLOWING.

11  Q.   WHAT ABOUT HIM HAVING THAT INFORMATION AND LETTING MALOOF

12  KNOW THAT, HEY, BE ON THE LOOKOUT FOR THIS WIRE IS

13  INCRIMINATING?  WHY IS IT THAT IT'S CRIMINAL THAT HE HAS THAT

14  INFORMATION AND LET'S HIM KNOW THAT THIS WIRE IS COMING.

15  A.   BECAUSE THAT'S THE ONLY WAY HE WOULD KNOW THE WIRE WAS

16  COMING.

17  Q.   OKAY.  UNDERSTOOD.

18        SO THE ONLY WAY HE KNOWS THAT HE'S WORKING WITH THE

19  BAD GUYS --

20  A.   YES.

21  Q.   -- SAYING, HEY, THIS WIRE IS COMING YOUR WAY --

22  A.   YEAH.  MONEY IS SITTING IN YOUR ACCOUNT THAT BELONGS TO ME

23  THAT YOU --

24  Q.   UNDERSTOOD --

25        (BOTH TALKING AT THE SAME TIME)

```
 1   A.  -- NEED TO PAY ME BACK.

 2   Q.  NOW I GET IT.

 3          SO LET'S TALK ABOUT MR. MALOOF A LITTLE BIT.

 4   A.  AH-HUH.

 5   Q.  MR. MALOOF WAS ACTUALLY ARRESTED IN ABOUT 2013 --

 6   A.  AH-HUH.

 7   Q.  -- WITH CASH AND DRUGS, IS THAT CORRECT?

 8   A.  YES.  IN A SEPARATE CHARGE FROM US.

 9   Q.  ALL RIGHT.  AND --

10   A.  NO DRUGS.  I'M SORRY.  NO DRUGS.

11   Q.  OKAY.

12   A.  IT WAS STRICTLY MONEY.

13   Q.  MY MISTAKE.

14          AND HE WAS ACTUALLY SUBSEQUENTLY INDICTED AND PLED

15   GUILTY IN THE SOUTHERN DISTRICT OF FLORIDA, IS THAT CORRECT?

16   A.  YOU'RE RIGHT.  IN A SEPARATE CHARGE.

17   Q.  AND IN THAT CASE HE WAS CHARGED WITH MONEY LAUNDERING AND

18   DRUG TRAFFICKING.

19   A.  MONEY LAUNDERING FROM THE DRUG PROCEEDS.  I BELIEVE IT WAS

20   1956, I THINK.  DON'T QUOTE ME, THOUGH.

21   Q.  NO PROBLEM.  AND HE WAS ALSO CHARGED WITH DRUG TRAFFICKING.

22   A.  NO.

23   Q.  NO?

24   A.  NOT THAT I'M AWARE OF.  AGAIN NOT MY CHARGE.

25   Q.  NO PROBLEM.
```

1      WOULD IT SURPRISE YOU TO KNOW THAT HE'S ALSO CHARGED

2  WITH DRUG TRAFFICKING?

3  A.  YES.

4  Q.  OKAY.  NOW, FROM WHAT I'M UNDERSTANDING IN THIS AFFIDAVIT

5  MR. MALOOF SEEMS TO BE THE KEY WITNESS AGAINST MR. YABRUDI FROM

6  THE AFFIDAVIT?

7  A.  RIGHT.  HE'S A WITNESS.  WE HAVE PLENTY OF DOCUMENTATION

8  OUTSIDE OF MALOOF.

9  Q.  I SEE THAT YOU'RE NOT AWARE THAT HE WAS ALSO CHARGED WITH

10  DRUG TRAFFICKING PER THE DOCKET IN THE SOUTHERN DISTRICT?

11  A.  HE MAY HAVE BEEN CHARGED.  HE WASN'T CONVICTED --

12  Q.  RIGHT.  BUT HE WAS CHARGED.

13  A.  OKAY.  BUT HE WAS CHARGED BUT HE WASN'T CONVICTED ON THAT.

14  LET ME CORRECT YOU ON THAT.

15  Q.  OKAY.

16  A.  I'M NOT AWARE OF HIS ORIGINAL CHARGE.  I'M AWARE OF HIS

17  CONVICTION.

18  Q.  ALL RIGHT.

19  A.  ALL RIGHT.

20  Q.  AND THAT CONVICTION COMES BECAUSE HE PLED GUILTY, RIGHT?

21  A.  YES.

22  Q.  AND AS A RESULT OF THAT GUILTY PLEA WAS SENTENCED TO 16

23  MONTHS?

24  A.  I DON'T -- YES.  THAT SOUNDS CORRECT.

25  Q.  ALL RIGHT.  SO --

```
 1              THE COURT:  IS THAT 16 OR 60?

 2              MR. CONCEPCION:  SIXTEEN MONTHS, YOUR HONOR.

 3              THE COURT:  SIXTEEN MONTHS.

 4              MR. CONCEPCION:  AND THREE YEARS OF SUPERVISED

 5    RELEASE.

 6    BY MR. CONCEPCION:

 7    Q.  SO MR. MALOOF DIDN'T JUST COME TO YOU GUYS OUT OF THE

 8    GOODNESS OF HIS HEART AND START GIVING INFORMATION.  HE DID

 9    THIS TO BETTER HIS OWN CIRCUMSTANCES AND GET A REDUCTION,

10    RIGHT?

11    A.  IT HAS NOTHING TO DO WITH THAT CHARGE.  WE HAVE NOT BEEN

12    INVOLVED IN THAT CHARGE IN ONE WAY -- IN ANY WAY WHATSOEVER.

13    Q.  OKAY.

14    A.  WE HAVE NOT -- NO.

15    Q.  SO BESIDES --

16    A.  AND I'M REFERRING TO DEA DALLAS WHENEVER I SAY THAT.

17    OBVIOUSLY OTHER PEOPLE HAVE BEEN INVOLVED.

18    Q.  SO BASED ON THIS AFFIDAVIT, LIKE YOU SAID THERE MIGHT BE

19    OTHERS, BUT ON THE AFFIDAVIT THE MAIN KIND OF CORROBORATING

20    WITNESS HERE FOR DEA IN DALLAS IS MR. MALOOF.

21    A.  AH-HUH.

22    Q.  -- WHO'S PLED GUILTY TO MONEY LAUNDERING --

23    A.  AH-HUH.

24    Q.  -- AND IS PRESUMABLY SEEKING A REDUCTION IN HIS SENTENCE BY

25    COOPERATING.
```

1    A.   THAT'S BETWEEN THE AUSA AND HIM.

2    Q.   SURE.   NOW, AS THE U.S. ATTORNEY SAID, THIS ISN'T THE FIRST

3    TIME YOU'VE MET WITH MR. YABRUDI, RIGHT?   YOU'VE MET WITH HIM

4    BEFORE.

5    A.   CORRECT.

6    Q.   IN FACT, HE FLEW ALL THE WAY TO TEXAS IN APPROXIMATELY JUNE

7    OF 2016 TO MEET WITH YOU, RIGHT?

8    A.   YES, SIR.

9    Q.   AND THAT MEETING WAS COORDINATED BY THE DEA IN MIAMI,

10    RIGHT?

11    A.   IT WAS A PHONE CALL.   SOMEONE -- HE HAD REACHED OUT TO DEA

12    AND DEA REACHED OUT TO US BECAUSE HE WANTED TO CONTACT US, YES.

13    Q.   OKAY.   AND WHEN HE WENT TO TEXAS HE WENT WITH A LOCAL MIAMI

14    DEA AGENT THAT WENT WITH HIM, RIGHT?

15    A.   A DEA AGENT CAME TO FIND OUT WHAT WAS BEING DISCUSSED, YES.

16    Q.   OKAY.   AND DURING THIS MEETING HE ANSWERED A MULTITUDE OF

17    QUESTIONS.   THE MEETING TOOK HOURS, RIGHT?

18    A.   YES.   SOME OF THEM UNTRUTH ANSWERS, BUT YES.

19    Q.   AND AT THIS TIME HE DIDN'T HAVE AN ATTORNEY PRESENT?

20    A.   NO.   HE WAIVED THAT RIGHT.

21    Q.   AND HE DIDN'T REQUEST AN ATTORNEY?

22    A.   NOPE.

23    Q.   AND IN FACT HE GAVE YOU INFORMATION REGARDING MR. MALOOF AS

24    WELL.

25    A.   INCORRECT INFORMATION, YES.

```
 1   Q.  BUT HE GAVE YOU INFORMATION.

 2   A.  YES.

 3   Q.  OKAY.  SO LET'S TURN BACK TO THIS TRANSACTION IN NOVEMBER

 4   OF 2016, WHICH IS KIND OF THE KEY TRANSACTION THAT'S MENTIONED

 5   IN THE INDICTMENT, THE 67,900?

 6   A.  AH-HUH.

 7   Q.  NOW, YOU SAID YOU BELIEVED THAT THIS MONEY PICK UP WAS DONE

 8   IN NEW YORK, RIGHT?

 9   A.  YES.

10   Q.  AND DO YOU REMEMBER WHAT --

11           (BOTH TALKING AT THE SAME TIME)

12   A.  -- NEW YORK.  I'M NOT EXACTLY CERTAIN.

13   Q.  DO YOU REMEMBER WHAT AGENT MAYBE YOU CONTACTED OR HAD

14   COMMUNICATIONS WITH IN NEW YORK REGARDING THIS?

15   A.  NO, NOT AT THE TOP OF MY HEAD.

16   Q.  OKAY.  DOES THE NAME JEROME C. ALLIO RING A BELL?

17   A.  YES.

18   Q.  OKAY.  IS THAT THE AGENT THAT WAS POSSIBLY WORKING --

19           (BOTH TALKING AT THE SAME TIME);

20   A.  IT COULD HAVE BEEN.  I HAVE WORK WITH NUMEROUS AGENTS UP

21   THERE, BUT I DO KNOW THAT PARTICULAR AGENT.

22   Q.  ALL RIGHT.  AND MR. JEROME, HE WORKS IN DEA NEW YORK?

23   A.  YES.

24   Q.  OKAY.  NOW, ARE YOU FAMILIAR WITH TINISHA D. WASHINGTON?

25   A.  YES.
```

```
 1    Q.  AND SHE'S ALSO A DEA AGENT.

 2    A.  SHE'S A TASK FORCE OFFICER IN DALLAS.

 3    Q.  OKAY.  AND WHAT ABOUT DELBERT RUTHERFORD?

 4    A.  YES.

 5    Q.  WHO IS HE?

 6    A.  HE'S ALSO A TOF IN DALLAS.

 7    Q.  OKAY.  NOW, WHAT IS -- ARE YOU FAMILIAR WITH A COMPANY

 8    NAMED VALENCIA LANDSCAPING, INC.?

 9    A.  YES.

10    Q.  AND HOW ARE YOU FAMILIAR WITH THAT COMPANY?

11    A.  THAT'S MY UNDERCOVER ACCOUNT.

12    Q.  OKAY.  SO IS THAT THE ACCOUNT THAT WAS USED IN THIS CASE TO

13    TRANSFER THE MONEY TO CELL NETWORK?

14    A.  YES.

15    Q.  OKAY.  SIR, DO YOU REMEMBER BEING -- LET ME STRIKE THAT.

16    LET ME BACK UP.

17         AS A TASK FORCE OFFICER ARE YOU PROVIDED A GOVERNMENT

18    E-MAIL TO CONDUCT BUSINESS BY?

19    A.  YES.

20    Q.  AND THIS GOVERNMENT E-MAIL, DOES IT IDENTIFY YOU AS A DEA

21    KIND OF OFFICER OR DOJ EMPLOYEE IN SOME WAY?

22    A.  ON THE BOTTOM, YES.

23    Q.  OKAY.

24    A.  IT HAS A USDOJ ON IT.

25    Q.  OKAY.  UNDERSTOOD.
```

1    SIR, DO YOU REMEMBER BEING COPIED IN AN E-MAIL FROM

2  AGENT RUTHERFORD TO AGENT JEROME ALLIO PROVIDING THE WIRE

3  TRANSFER OF $67,900 FROM VALENCIA LANDSCAPING TO CELL NETWORK?

4  A.  I'M SORRY.  SAY THAT AGAIN?  PROVIDING -- IT WENT THE OTHER

5  WAY AROUND IF I'M UNDERSTANDING YOUR QUESTION RIGHT.

6    I DO NOT RECALL THE E-MAIL FIRST OF ALL, BUT IT SHOULD

7  HAVE BEEN AN E-MAIL FROM NEW YORK TO US IF THAT'S WHAT YOU'RE

8  SAYING.

9  Q.  NOW, IN THIS CASE YOU WIRED THE MONEY TO CELL NETWORK.  SO

10  WOULDN'T YOU PROVIDE NEW YORK THE CONFIRMATION OF THE WIRE

11  TRANSFER?

12  A.  I'M SORRY.  I MISUNDERSTOOD WHAT YOU WERE SAYING.  YES.

13  YES, WE WOULD HAVE TOLD THEM THAT -- THAT THAT'S WHAT HAPPENED,

14  YES.

15  Q.  OKAY.  AND WHY DOES THAT INFORMATION GET SHARED WITH

16  NEW YORK?

17  A.  BECAUSE THEY HAVE TO DO THEIR REPORTS BECAUSE THEY -- THEY

18  HAVE TO ANNOTATE WHERE THAT MONEY WENT.

19  Q.  OKAY.  AND NOW DOES THAT INFORMATION ALSO GET DISBURSED TO

20  OTHER PEOPLE INVOLVED IN THE INVESTIGATION LIKE INFORMANTS?

21  A.  I HOPE NOT.

22  Q.  OKAY.  SO IT WOULD SURPRISE YOU THAT IF THAT INFORMATION

23  WAS SHARED WITH AN INFORMANT?

24  A.  AS FAR AS MY KNOWLEDGE -- WELL, FIRST OF ALL, YES.

25  Q.  IT WOULD SURPRISE YOU.

1  A.  YES.

2  Q.  OKAY.  NOW, I DON'T REMEMBER YOUR ANSWER.  DO YOU REMEMBER

3  THIS E-MAIL OR NO?

4  A.  NO.  I DO NOT REMEMBER THE E-MAIL, BUT THOSE -- THOSE ARE

5  CONSISTENT WITH WHAT WE NORMALLY DO.

6          MR. CONCEPCION:  YOUR HONOR, I WOULD LIKE TO ENTER

7  INTO EVIDENCE AN E-MAIL, AND I'VE GOT A COPY HERE FOR THE

8  GOVERNMENT.

9          MAY I APPROACH THE WITNESS AND YOUR HONOR TO PROVIDE

10  YOU WITH THE E-MAIL?

11          THE COURT:  YES.

12  BY MR. CONCEPCION:

13  Q.  NOW, SIR, IF I WILL TURN TO --

14          MR. CONCEPCION:  AND, YOUR HONOR, I WOULD ENTER THIS

15  AS EXHIBIT 1.

16          THE COURT:  ANY OBJECTION FROM THE GOVERNMENT?

17          MR. CONCEPCION:  TO THE THIRD PAGE --

18          MR. BEHNKE:  THIS IS MARCH 29, 2018.  WHAT RELEVANCE

19  DOES THIS HAVE TO THE ALLEGED TRANSACTIONS?

20          MR. CONCEPCION:  WELL, YOUR HONOR, IF YOU LOOK DOWN TO

21  THE BACK, WHICH IS THE ORIGINAL E-MAIL YOU'LL SEE THAT THIS

22  E-MAIL IS ORIGINALLY DATED NOVEMBER 22ND, 2016, WHICH IS THE

23  TRANSACTION WE'RE TALKING ABOUT.

24          AND IF WE TURN TO THE THIRD PAGE WE'RE GOING TO SEE A

25  WIRE CONFIRMATION FOR THE EXACT AMOUNT THAT WE'RE TALKING

 1  ABOUT, 67,900 FROM VALENCIA LANDSCAPING, WHICH IS THE WITNESS'

 2  UNDERCOVER ACCOUNT TO CELL NETWORK WHICH IS MALOOF'S ACCOUNT.

 3  ALL RIGHT?

 4          ALL RIGHT.  SO WE'VE GOT THE WIRE CONFIRMATION.  NOW

 5  IF YOU TURN TO THE --

 6          MR. BEHNKE:  SO SHE GOT A COPY FROM MALOOF, OR

 7  SOMEBODY FROM MALOOF, AND THEN SHE'S SENDING IT TO US IN 2018,

 8  IS THAT WHAT YOU'RE ALLEGING?

 9          MR. CONCEPCION:  WELL, IF YOU LET ME WORK WITH THE

10  EXHIBIT I CAN GO OVER IT.

11          MR. BEHNKE:  I'M JUST TRYING TO THE SIGNIFICANCE.

12          THE COURT:  I'M NOT GOING TO ADMIT IT YET, BUT HE CAN

13  ASK YOU QUESTIONS AND SEE IF YOU CAN --

14          MR. CONCEPCION:  SURE.

15          (BOTH TALKING AT THE SAME TIME)

16  BY MR. CONCEPCION:

17  Q.  SO IF YOU TURN TO THE SECONDS PAGE, SIR, YOU'LL SEE THAT

18  THE FIRST E-MAIL IS FROM AGENT DELBERT RUTHERFORD, WHICH IS AN

19  AGENT IN YOUR OFFICE --

20  A.  AH-HUM HUM.

21  Q.  -- RIGHT?

22          AND IF YOU LOOK AT THE CC LINE, YOU'RE CC'D ON THIS

23  E-MAIL, RALPH WOODS.

24  A.  YES.

25  Q.  IT'S ALSO CC'ING TINESHA WASHINGTON?

1  A.  AH-HUH.

2  Q.  AND IT'S BEING SENT TO JEROME ALLIO, WHICH IS A DEA AGENT

3  IN NEW YORK.

4  A.  OKAY.

5  Q.  ALL RIGHT?

6       SO IF WE GO UP TO THE NEXT E-MAIL YOU'RE GOING TO SEE

7  THAT ON NOVEMBER 23RD, THE VERY NEXT DAY, RIGHT, WE GOT AN

8  E-MAIL FROM JEROME WHICH IS A NEW YORK DEA OFFICER --

9  A.  AH-HUH.

10  Q.  -- TO AN E-MAIL THAT SAYS, MIAMICARGO@HOTMAIL.COM --

11  A.  OKAY.

12  Q.  -- IS THAT RIGHT?

13       ARE YOU FAMILIAR WITH THE E-MAIL,

14  MIAMICARGO@HOTMAIL.COM?

15  A.  NO.

16  Q.  ARE YOU AWARE THAT THAT IS A DEA ACCOUNT IN MIAMI?

17  A.  OKAY.  I'M NOT.  BUT OKAY.

18  Q.  ALL RIGHT.  SO -- THEN WE'RE GOING TO MOVE ON TO THE NEXT

19  E-MAIL --

20  A.  OKAY.

21  Q.  -- WHICH IS NOVEMBER 23RD, 2016.

22  A.  OKAY.

23  Q.  ALL RIGHT?  AND THAT E-MAIL IS MIAMI CARGO TO

24  FABIMONTI1891@GMAIL --

25  A.  OKAY.

```
 1  Q.  -- AND FABIMONTI@HOTMAIL.COM.

 2  A.  OKAY.

 3  Q.  ALL RIGHT.  ARE YOU AWARE THAT FABIMONTI1898 IS THE

 4  DEFENDANT'S E-MAIL ACCOUNT, MR. YABRUDI?

 5  A.  NO.

 6  Q.  ARE YOU AWARE THAT FABIMONTI@HOTMAIL.COM IS THE E-MAIL

 7  ACCOUNT FOR MR. YABRUDI?

 8  A.  NO.

 9  Q.  OKAY.  NOW, WOULD IT SEEM LIKE HERE, SIR, IS THAT THE

10  CONFIRMATION FOR THIS WIRE OF SIXTY-SEVEN THOUSAND DOLLARS AND

11  NINE HUNDRED --

12  A.  AH-HUH.

13  Q.  -- WAS PROVIDED TO MR. YABRUDI BY DEA.

14  A.  DO YOU LIKE AN EXPLANATION?

15  Q.  WHAT WAS THAT?

16  A.  WOULD YOU LIKE AN EXPLANATION?

17  Q.  SURE THING.

18  A.  OKAY.  WHAT IT IS, HE WENT THROUGH -- HE WENT THROUGH

19  ANOTHER INFORMANT WHENEVER HE DID THIS PARTICULAR WIRE.  THAT

20  INFORMANT APPEARS TO HAVE FORWARDED THIS WIRE TO HIM.

21  Q.  OKAY.  SO HE FORWARDS THE ENTIRE E-MAIL STRING SHOWING ALL

22  THE DEA --

23  A.  SURE.

24  Q.  -- E-MAILS.

25          SO IF MR. YABRUDI IS, QUOTE, UNQUOTE, WORKING THE BAD
```

1    GUYS AND HE SEES THIS WIRE IS COMING FROM DEA --

2    A.  AH-HUM.

3    Q.  -- WHY WOULD HE MOVE FORWARD?  WOULDN'T THIS BE A RED FLAG

4    TO HIM?

5    A.  NO.

6    Q.  NO.

7    A.  NOT AT ALL.

8    Q.  OKAY.  WHY IS THAT?

9    A.  BECAUSE HE DOESN'T ANTICIPATE ANYBODY DOING ANYTHING WITH

10   HIM AT THIS STAGE BECAUSE HE KNOWS WHERE THE MONEY IS GOING TO

11   GO THROUGH.  HE UNDERSTANDS IT'S COMING FROM A DEA.  HE ALSO

12   UNDERSTAND IT'S NARCOTIC PROCEEDS.

13         BY THIS RIGHT HERE, I'M GOING TO TELL YOU RIGHT NOW IT

14   APPEARS THAT YOU HAVE ANOTHER INFORMANT THAT IS WORKING OUTSIDE

15   OF THE DEA.

16   Q.  NOW --

17   A.  SO YOU HAVE AN INFORMANT THAT IS PROVIDING DOCUMENTATION

18   FROM DEA TO SOMEONE THAT IS NOT AN INFORMANT BECAUSE THEY ARE

19   WORKING TO FURTHER LAUNDER MONEY.  SO THIS RIGHT HERE TO ME

20   IMPLICATES ANOTHER INFORMANT.

21   Q.  NOW, PREVIOUSLY YOU SAID YOU'D BE SURPRISED IF A DEA AGENT

22   SHARED A WIRE CONFIRMATION WITH ANY INFORMANT.

23   A.  RIGHT.

24   Q.  BUT HERE WE HAVE AGENT JEROME SHARING IT WITH AN

25   INFORMANT --

1  A.  SURE.

2  Q.  -- OR A DEA ACCOUNT E-MAIL.

3  A.  SURE.  AND ABSOLUTELY.  ABSOLUTELY.

4       WHAT THIS DOES IS, IT SHOWS THAT YOU HAVE AN INFORMANT

5  THAT IS MANAGING AN ACCOUNT AND THEN SHARING IT WITH SOMEONE

6  OUTSIDE OF DEA.  THAT'S WHAT YOU HAVE.

7  Q.  IT CAN ALSO BE EVIDENCE --

8  A.  NO.  THAT'S WHAT'S YOU HAVE.

9  Q.  IT COULD ALSO WE EVIDENCE THAT MR. YABRUDI WAS WORKING WITH

10 THE DEA.

11 A.  NO.  HE WAS NOT SIGNED UP IN ANY WAY, SHAPE, FORM, OR

12 FASHION IN THAT TIME FRAME.

13 Q.  BUT HE --

14 A.  NO, HE WAS NOT.

15 Q.  WHILE HE MIGHT NOT BE SIGNED UP HE MAY ALSO BE WORKING

16 UNDER THE OFFICE AND CONTROL OF THE DEA.

17 A.  NOT IF HE'S NOT SIGNED UP.  HE'S NOT SIGNED UP.

18 Q.  OKAY.

19 A.  SO IF HE'S OPERATING UNDER THE DIRECTION OF THE DEA I DON'T

20 KNOW HOW WOULD HAPPEN.  THAT CAN'T HAPPEN.

21 Q.  SO YOU ADMIT THAT HE'S RECEIVING E-MAILS FROM THE DEA --

22 A.  NO.

23 Q.  -- GETTING THAT WIRE INFORMATION?

24 A.  NO.  HE IS NOT RECEIVING E-MAIL FROM THE DEA.  HE RECEIVED

25 AN E-MAIL FROM ANOTHER INFORMANT.

1  Q.   IF MIAMICARGO@HOTMAIL.COM IS A DEA UNDERCOVER ACCOUNT --

2  A.   WHICH YOU'RE SAYING THAT.  I -- I BELIEVE THAT THAT IS AN

3  INFORMANT.

4          MR. BEHNKE:  YOUR HONOR, OBJECTING TO THE

5  IDENTIFICATION OF THAT AS AN UNDERCOVER DEA WEBSITE BECAUSE

6  IT'S NOT BEEN SUBSTANTIATED.

7          THE COURT:  NO.  THE WITNESS IS NOT CONFIRMING IT.

8  SO IT'S --

9          MR. CONCEPCION:  I'M JUST SAYING IF IT IS, IT WOULD BE

10  EVIDENCE THAT HE'S WORKING THE DEA OR AT LEAST HE BELIEVES HE

11  IS.

12          THE COURT:  OKAY.

13          MR. CONCEPCION:  YOUR HONOR, I WOULD MOVE TO ENTER

14  THIS EXHIBIT INTO EVIDENCE AS EXHIBIT 1.

15          THE COURT:  THAT WILL BE ADMITTED.

16          ANY OBJECTION?

17          MR. BEHNKE:  WE OBJECT.

18          THE COURT:  I'LL ADMIT IT.

19          MR. CONCEPCION:  COULD I HAVE ONE SECOND, YOUR HONOR?

20          THE COURT:  YES.

21          WOULD YOU MARK THAT.

22          MR. CONCEPCION:  OKAY, YOUR HONOR.

23          NO FURTHER QUESTIONS AT THIS TIME.

24          THE COURT:  ALL RIGHT.

25          ANY REDIRECT?

```
 1              MR. BEHNKE:  QUICKLY.

 2                    REDIRECT EXAMINATION

 3   BY MR. BEHNKE:

 4   Q.  YOU SAID THAT YOU HAVE MET WITH MR. YABRUDI ON SEVERAL

 5   OCCASIONS, A COUPLE OCCASIONS?

 6   A.  JUST THE ONE.

 7   Q.  ONE.

 8   A.  ONE OCCASION.

 9   Q.  ONE OCCASION.  OKAY.

10         DURING THAT INTERVIEW WERE YOU -- DID YOU COMMUNICATE

11   WITH HIM ABOUT WHETHER OR NOT HE KNEW HOW HE WAS SUPPOSED TO BE

12   DOCUMENTED BEFORE HE WAS DOING UNDERCOVER OPERATIONS FOR DEA?

13   A.  YES.  HE UNDERSTOOD THE PROCEDURES IN WHICH HE WOULD BE AN

14   INFORMANT.

15   Q.  AND WAS ONE OF THOSE PROCEDURES THAT HE MUST BE DOCUMENTED

16   AT THE TIME HE'S ENGAGING IN ANY UNDERCOVER WORK FOR DEA?

17   A.  YES.

18   Q.  OKAY.  DID YOU ASK HIM WHETHER HE WAS INVOLVED IN ANY

19   UNDERCOVER OPERATIONS DURING THE PERIOD THAT'S RECITED IN THE

20   NEW INDICTMENT, THAT IS THE ALLEGATIONS THAT ARE MADE AGAINST

21   HIM?

22   A.  YES, SIR, WE DID.

23   Q.  AND WHAT DID HE SAY?

24   A.  HE SAID HE UNDERSTOOD THAT HE WAS DEACTIVATED DURING THAT

25   TIME FRAME.
```

1  Q.  ALL RIGHT.  SO HE WOULD NOT HAVE BEEN WORKING LEGITIMATELY

2  FOR DEA DURING THAT PERIOD OF TIME.

3  A.  CORRECT.

4          MR. BEHNKE:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

5          THE COURT:  LET ME MAKE SURE I UNDERSTAND THAT.

6          YOU'RE SAYING WHEN YOU SPOKE WITH HIM, YOU SPOKE ABOUT

7  THE CHARGES THAT ARE LISTED IN THIS COMPLAINT AND HE

8  ACKNOWLEDGED THAT HE WAS NOT WORKING FOR THE DEA AT THE TIME?

9          THE WITNESS:  WE DISCUSSED DURING THIS PARTICULAR TIME

10 FRAME THAT THE OFFENSE OCCURRED AT?

11          THE COURT:  YES.

12          THE WITNESS:  WE SPECIFICALLY ASKED HIM IF HE WAS

13 ACTIVATED AS AN INFORMANT DURING THAT TIME AND HE SAID HE

14 WAS -- HE UNDERSTOOD THAT HE WAS DEACTIVATED DURING THAT TIME

15 FRAME.

16          THE COURT:  OKAY.  YOU DISCUSSED THE TIME PERIOD.  DID

17 YOU SPECIFICALLY DISCUSS THE ACTIVITIES THAT ARE ALLEGED IN THE

18 COMPLAINT?

19          THE WITNESS:  WE DISCUSSED THOSE TRANSACTIONS.  WE

20 MENTIONED THOSE TRANSACTIONS AND HE WAS UNAWARE OF ANY OF THOSE

21 TRANSACTIONS IS WHAT HE TOLD US.

22          THE COURT:  BUT HE ACKNOWLEDGED THAT HE WAS NOT AN

23 ACTIVE INFORMANT FOR THE DEA?

24          THE WITNESS:  CORRECT.

25          THE COURT:  OKAY.

1              MR. BEHNKE:  CAN I FOLLOW UP ON THAT?

2              THE COURT:  SURE.

3    BY MR. BEHNKE:

4    Q.  DID HE ALSO INDICATE WHETHER OR NOT HE HAD ANY ACTIVE DEA

5    INVESTIGATIONS INVOLVING MR. YABRUDI, HIS CONDUCT WITH

6    MR. YABRUDI?

7    A.  YOU MEAN MR. MALOOF?

8    Q.  I MEAN MR. MALOOF.  YES.

9    A.  HE HAD TOLD US - HE HAD INFORMED US OF MR. MALOOF, INFORMED

10   BOSTON DEA OF MR. MALOOF BUT HE DID NOT INFORM US OF ANY ACTIVE

11   INVESTIGATION THAT HE WAS INVOLVED IN INVOLVING MR. MALOOF.

12   Q.  DID YOU ASK HIM THAT QUESTION?

13   A.  I CANNOT SAY FOR CERTAIN IF WE DID.

14   Q.  ALL RIGHT.  DID ANY OTHER DEA AGENTS OR ANY OTHER LAW

15   ENFORCEMENT INDICATE TO YOU THAT MR. MALOOF WAS IN ANY WAY

16   ENGAGED -- EXCUSE ME.  MR. YABRUDI WAS IN ANY WAY ENGAGED IN

17   THE INVESTIGATION OF MR. MALOOF?

18   A.  NO.  THEY WERE NOT -- HE WAS NOT ACTIVELY INVOLVED IN ANY

19   INVESTIGATION TO MY KNOWLEDGE --

20   Q.  ALL RIGHT.

21   A.  -- WITH MR. MALOOF.

22             MR. BEHNKE:  NO FURTHER QUESTIONS, YOUR HONOR.

23             THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

24             DOES THAT CONCLUDE THE GOVERNMENT'S CASE?

25             MR. BEHNKE:  YES, YOUR HONOR.  THE GOVERNMENT RESTS.

1          THE COURT:  ALL RIGHT.

2          MR. CONCEPCION, DO YOU HAVE ANY EVIDENCE, TESTIMONY,

3   OR OTHER --

4          MR. CONCEPCION:  YES, YOUR HONOR.  WE WOULD LIKE TO

5   PROCEED BY PROFFER AND THEN WE CAN MOVE INTO ARGUMENT IF THE

6   COURT WANTS.

7          THE COURT:  SURE.

8          MR. CONCEPCION:  OKAY.

9          THE COURT:  DO YOU HAVE THE PRETRIAL SERVICES REPORT?

10          A VOICE:  YES, SIR, JUDGE.

11          THE COURT:  PLEASE LET ME KNOW WHETHER THE INFORMATION

12   IN THE PRETRIAL SERVICE REPORT IS ACCURATE.

13          THANK YOU.

14          YOU MAY PROCEED.

15          MR. CONCEPCION:  OKAY, YOUR HONOR.

16          UNDER 18, USC -- I APOLOGIZE.  FROM THE FACTUAL

17   PROFFER, YOUR HONOR, MR. YABRUDI WOULD PROFFER THAT FIRST HE

18   HAS NO MENTAL HEALTH ISSUES, HAS NEVER BEEN DIAGNOSED WITH ANY

19   MENTAL HEALTH ISSUES.  HE HAS BEEN DIAGNOSED WITH CHRONIC

20   HEALTH CONDITION WHICH IS ULCER OF COLITIS WHICH HE HAS --

21   UNDERGOING TREATMENT FOR HERE IN MIAMI.

22          HE HAS SIGNIFICANT FAMILY TIES TO THE COMMUNITY HERE

23   IN MIAMI.  TWO OF HIS YOUNG CHILDREN LIVE IN MIAMI WITH THEIR

24   MOTHER WITH WHOM HE SHARES A HOME WITH.  HE IS ACTIVE IN THE

25   COMMUNITY.  HE ATTENDS HIS LOCAL CHURCH.  HE HAS HIS OWN

 1  BUSINESS WHICH IS FLOHAMMER.  HE DOES CONSTRUCTION WORK.  AND
 2  TO THE GOVERNMENT'S ARGUMENT THAT THERE WAS NOT CONSTRUCTION
 3  EQUIPMENT, MR. YABRUDI ROUTINELY HIRES SUBCONTRACTORS FOR THE
 4  WORK.

 5         HE IS THE SOLE BREADWINNER FOR HIS FAMILY.  HE HAS NO
 6  CRIMINAL HISTORY.  HE'S NEVER BEEN CONVICTED OF ANY CRIME.  HE
 7  HAS NO HISTORY OF VIOLENCE.

 8         AS THE GOVERNMENT HAS FREELY ADMITTED HE WORKED FOR
 9  THE GOVERNMENT FOR YEARS AND HELPING THEM IDENTIFY TARGETS AND
10  CAPTURE MONEY LAUNDERERS AND DRUG DEALERS.  HE HAS NO HISTORY
11  OF DRUG USE.

12         MR. YABRUDI, AS THE GOVERNMENT AGAIN ADMITTED FREELY,
13  TRAVELED TO TEXAS AND SAT DOWN AND SPOKE WITH THE GOVERNMENT
14  ABOUT HIS ACTIVITIES AND HIS ACTIONS.  HE WENT THERE.  THAT
15  MEETING WAS COORDINATED THROUGH DEA IN MIAMI.  HE WENT THERE
16  WITH A DEA AGENT.

17         AND IN REGARDS TO THAT MEETING, YOUR HONOR,
18  MR. YABRUDI WOULD POINT OUT THAT THERE WAS NO ONE THERE THAT
19  SPOKE SPANISH THAT COULD HELP HIM COMMUNICATE WITH THE AGENTS.
20  WHILE HE SPEAKS SOME LIMITED ENGLISH IT'S VERY LIMITED.  SO
21  WHILE THERE WAS MANY COMMUNICATIONS BACK AND FORTH IN THAT
22  MEETING, TO BE HONEST THERE MIGHT JUST BE A MISUNDERSTANDING OF
23  WHAT WAS COMMUNICATED.

24         THERE IS NO TRANSCRIPT OF THAT MEETING.  IT WASN'T
25  SWORN.  THAT WAS JUST AN OFF THE BOOKS SIT DOWN WHERE HE HELPED

1 DEA IN DALLAS IDENTIFY TARGETS AND LEARN ABOUT WHAT HE WAS

2 DOING.  HE WASN'T HIDING ANYTHING.  HE FREELY WENT OVER THERE

3 AND TRAVELED THERE.  AND THE FACT THAT THEY WANT TO DETAIN HIM

4 NOW WHEN HE HAS IN THE PAST SHOWN THAT HE HAS NO INTENTION OF

5 DODGING THEM OR, YOU KNOW, AVOIDING THESE CHARGES IS UNFAIR TO

6 HIM.

7 THE COURT:  WELL, I THINK THE TESTIMONY WAS THAT HE

8 MET WITH THEM BUT THAT HE GAVE INCORRECT INFORMATION.  SO WHAT

9 DO YOU WANT ME TO TAKE FROM THAT MEETING?  HE SHOULD GET CREDIT

10 BECAUSE HE TALKED TO THEM OR ADMIT ANYTHING THAT THE AGENT SAYS

11 IS INCORRECT WAS MIS --

12 MR. CONCEPCION:  WELL, YOUR HONOR, I HAVE NO -- I HAVE

13 NO DETAILS ABOUT WHAT THEY'RE SAYING WAS INCORRECT OR NOT.

14 ALL WE HAVE IN FRONT OF US IS AN AFFIDAVIT WHOSE MAIN

15 SOURCE OF INFORMATION IS A CONVICTED FELON LOOKING TO GET A

16 REDUCTION.  THAT'S ALL THAT'S TYING MR. YABRUDI TO THIS CASE,

17 PARTICULARLY THE MAIN TRANSACTION THAT WE'RE TALKING ABOUT

18 HERE, $67,900, WE PROVIDED EVIDENCE THAT HE WAS INFORMED OF

19 THAT TRANSACTION BY DEA ITSELF OR A DEA INFORMANT.

20 NOW, THE IDEA THAT SOMEONE WHO IS TRYING TO DO THINGS

21 ILLEGALLY RECEIVES AN E-MAIL STRING WITH DEA E-MAILS ALL OVER

22 IT AND WOULD SAY, OH.  YOU KNOW, I'M UNTOUCHABLE.  I'M JUST

23 GOING TO GO FORWARD, THAT JUST DOESN'T MAKE ANY SENSE.  IF HE'S

24 TRYING TO DO THIS BEHIND THEIR BACK WHAT PERSON WOULD SEE THAT

25 AND NOT JUST RUN FOR THE EXITS RIGHT THERE?

1            THE AGENT SAID THERE IS NO OTHER WAY HE WOULD KNOW

2   ABOUT THIS TRANSACTION UNLESS HE WAS WORKING WITH THE BAD GUYS.

3   WE'VE PROVIDED EVIDENCE THAT HE KNEW ABOUT THIS TRANSACTION

4   DIRECTLY FROM DEA.  SO -- AND, YOUR HONOR -- IF YOUR HONOR

5   WOULD LIKE, I HAVE DOZENS OF OTHER E-MAILS FROM MIAMI CARGO

6   PROVIDING DOZENS OF OTHER WIRES TO HIM.

7            MR. YABRUDI WORKED WITH DEA AND OTHER DEA INFORMANTS.

8   IT'S CLEAR FROM HIS HISTORY HE'S WORKED WITH NEW YORK, HE'S

9   WORKED WITH BOSTON, HE'S WORKED WITH MIAMI AND EVERYTHING HE

10  WAS DOING WAS AT THEIR DIRECTION AND TO HELP THEM.

11           AND IN THIS PARTICULAR INSTANCE, THIS TRANSACTION,

12  IT'S EVIDENT BASED ON THAT E-MAIL THAT HE KNEW ABOUT THIS

13  TRANSACTION FROM THE DEA.

14           THE COURT:  WHAT'S YOUR EVIDENCE THAT MIAMI CARGO IS A

15  DEA ACCOUNT?

16           MR. CONCEPCION:  WHAT WAS THAT, YOUR HONOR?

17           THE COURT:  YOU SAID THAT MIAMI CARGO IS A DEA ACCOUNT

18  AND THE AGENT SAID HE WASN'T AWARE OF THAT.  WHAT'S YOUR

19  EVIDENCE THAT THAT'S A DEA ACCOUNT?

20           MR. CONCEPCION:  MR. YABRUDI.  YOUR HONOR, MR. YABRUDI

21  SAYS THAT THAT'S AN E-MAIL HE USED REGULARLY TO COMMUNICATE

22  WITH DEA AND IT'S INFORMANTS.

23           NOW, YOUR HONOR, GOING INTO THE ARGUMENT --

24           THE COURT:  BEFORE YOU GO INTO ARGUMENT LET ME GIVE

25  THE GOVERNMENT TO ARGUE.

```
 1            MR. CONCEPCION:  SURE.

 2            THE COURT:  MR. BEHNKE?

 3            MR. BEHNKE, A BRIEF ARGUMENT?

 4            MR. BEHNKE:  YES, YOUR HONOR.

 5            I JUST WANTED TO POINT OUT, FIRST OF ALL I'M ADVISED

 6   SINCE IT CAME UP JUST NOW BY MY WITNESS THAT THERE WAS AN

 7   INTERPRETER THERE WHEN MR. YABRUDI WAS BEING DEBRIEFED.  SO HE

 8   WAS DEBRIEFED IN SPANISH AND HE WAS COMFORTABLE WITH WHAT HE

 9   SAID.  IT WAS WELL DOCUMENTED.  SO HE WAS NOT CONFUSED AND

10   MISUNDERSTOOD WHAT WAS BEING (INAUDIBLE) TO HIM.

11            THE COURT:  OKAY.

12            MR. BEHNKE:  SECONDLY, I DON'T BELIEVE MIAMI CARGO --

13   THE AGENT WOULD HAVE KNOWLEDGE OF THE TRANSACTIONS THAT WERE

14   BEING CONDUCTED.  MIAMI CARGO WAS NOT IN ANY WAY IMPLICATED IN

15   ANY OF THE TRANSACTIONS, I DON'T BELIEVE.

16            IS THAT CORRECT?

17            THE AGENT:  NOT THAT I'M AWARE OF.

18            MR. BEHNKE:  SO WE DON'T HAVE ANY KNOWLEDGE THAT MIAMI

19   CARGO, IF IT IS AN UNDERCOVER OPERATION -- A DEA UNDERCOVER

20   OPERATION HAS ANYTHING TO DO WITH ANY OF THE TRANSACTIONS THAT

21   ARE GOING TO BE ALLEGED AGAINST MR. YABRUDI IN THE INDICTMENT.

22            THE COURT:  OKAY.

23            MR. BEHNKE:  THANK YOU, SIR.

24            NOTHING FURTHER.

25            OH.  AND THERE IS ABSOLUTELY NO FINANCIAL EVIDENCE
```

1 WHATSOEVER THAT IS CONSTRUCTION COMPANY IS ACTUALLY OPERATING

2 AND GENERATING INCOME, NONE.

3       THE COURT:  OKAY.

4       MR. BEHNKE:  BY THE WAY, AND HIS FAMILY MEMBERS ARE

5 COMPLICIT THE ACTIVITY THAT'S GOING ON, THE ILLEGAL ACTIVITY.

6       THE COURT:  ALL RIGHT.

7       MR. CONCEPCION, ANY ARGUMENT?

8       MR. CONCEPCION:  YES, SIR.

9       YOUR HONOR, UNDER 18, USC, 3142, THE GOVERNMENT HAD TO

10 PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT MR. YABRUDI WAS A

11 SERIOUS -- WAS A FLIGHT RISK.

12       NOW, THE COURT HAS TO CONSIDER WHETHER ANY POSSIBLE

13 BAIL CONDITIONS FOR A DETENTION HEARING WOULD REASONABLY ASSURE

14 HIS APPEARANCE AT FUTURE HEARINGS.  IT DOESN'T HAVE TO

15 GUARANTEE IT, IT JUST HAS TO BE A REASONABLE ASSURANCE.  OKAY?

16       YOUR HONOR, THE -- IN REGARD TO THIS INDICTMENT.  THE

17 GOVERNMENT HAS FAILED TO SHOW THAT MR. YABRUDI IS A SERIOUS

18 FLIGHT RISK.  WHAT WE'VE SHOWN IS THAT MR. YABRUDI HAS WORKED

19 FOR THE DEA FOUR YEARS.  HE'S VOLUNTARILY TRAVELED TO TEXAS

20 BEFORE TO SIT DOWN WITH AGENTS AND PROSECUTORS AND TALK ABOUT

21 THIS CASE AND OTHER CASES.  OKAY?  HE HAS NO CRIMINAL HISTORY

22 THAT WOULD INDICATE THAT HE IS SOMEONE THAT WOULD FLEE.

23       THE MERE FACT THAT HE IS ORIGINALLY A FOREIGN NATIONAL

24 SHOULD NOT PRECLUDE HIM FROM RECEIVING BAIL.  IN FACT, IF WE

25 WOULD POINT OUT AT THE CASE OF MR. MALOOF WHO WAS NOT ONLY

1  CHARGED WITH MONEY LAUNDERING BUT ALSO DRUG TRAFFICKING,

2  MR. MALOOF WAS GIVEN BAIL.  BUT MR. YABRUDI WHO HAS PROVIDED

3  INFORMATION ON MR. MALOOF AND HAS A -- LESS CHARGES THAN HIM

4  THEY'RE SAYING HE SHOULDN'T RECEIVE BAIL.

5         MR. YABRUDI SHOULD BE RELEASED ON BAIL AND GIVEN THE

6  OPPORTUNITY TO SELF-SURRENDER IN TEXAS.  HE HAS EVERY INTENTION

7  OF FIGHTING THESE CHARGES.  IT'S CLEAR THAT THE EVIDENCE

8  AGAINST MR. YABRUDI IS NOT SUBSTANTIAL.  HE HAS EVIDENCE TO

9  PROVE HIS INNOCENCE AND EXPLAIN HIS BEHAVIOR, EVIDENCE BY THE

10  E-MAILS AND I'M SURE FUTURE INFORMATION THAT WILL COME TO

11  LIGHT.  BASED ON THE WEIGHT OF THAT EVIDENCE ALONE MR. YABRUDI

12  SHOULD RECEIVE BAIL.

13         AND MOVING TO THE REMOVAL HEARING.  I THINK THAT THERE

14  IS A SERIOUS QUESTION WHETHER PROBABLE CAUSE EXISTS.  THE ONLY

15  TRANSACTIONS THAT WE'RE TALKING ABOUT IN THIS AFFIDAVIT AS

16  BASED FOR THE COMPLAINT ARE THE $67,900.

17         WE HAVE PROVIDED THAT MR. YABRUDI HAD THAT INFORMATION

18  VIA DEA.  THE AGENT SAID PRIOR TO SHOWING THAT E-MAIL THERE IS

19  NO WAY HE KNEW ABOUT THAT TRANSACTION UNLESS HE WAS WORKING

20  WITH THE BAD GUYS.  BUT WE ARE ABLE TO PROVIDE AN E-MAIL WITH A

21  STRING OF DEA E-MAILS FORWARDING IT TO HIM.  SO THERE IS

22  CLEARLY OTHER WAYS HE WAS ABLE TO FIND OUT ABOUT THIS

23  TRANSACTION.

24         SINCE THAT BEING -- IS THE SOLE BASIS CONNECTING

25  MR. YABRUDI TO TEXAS, I THINK THAT THERE IS A LEGITIMATE CAUSE

1  THAT THERE IS NOT PROBABLE CAUSE FOR THIS ARREST WARRANT OR

2  COMPLAINT.

3       IF THE GOVERNMENT LATER ON WANTS TO BRING AN

4  INDICTMENT, THAT'S A DIFFERENT STORY.  WE CAN ADDRESS THAT

5  THEN.  BUT JUST ON THE FACE OF THIS AFFIDAVIT I THINK THERE IS

6  A REAL ISSUE WITH PROBABLE CAUSE AND ALSO VENUE FOR THE

7  CONNECTION TO TEXAS.

8       SO, YOUR HONOR, I THINK AT THIS TIME WE WOULD

9  RELEASE -- WE WOULD ASK THAT, ONE, THE COMPLAINT BE DISMISSED.

10  IF YOUR HONOR IS NOT INCLINED TO DO THAT WE WOULD ASK THAT

11  MR. YABRUDI BE RELEASED ON HIS PERSONAL RECOGNIZANCE OR ON THE

12  EXECUTION OF AN UNSECURED BOND SO THAT HE MAY SELF-SURRENDER IN

13  TEXAS.  AT WORSE CASE, YOUR HONOR, THERE HAS TO BE A

14  COMBINATION OF CONDITIONS THAT WOULD SATISFY THIS COURT THAT

15  MR. YABRUDI WOULD SELF-SURRENDER IN TEXAS.

16       HE HAS NO HISTORY OF FLEEING OR NOT SHOWING UP TO

17  COURT APPEARANCES.  HE'S MORE THAN WILLING TO FACE THESE

18  CHARGES AND PROVE HIS INNOCENCE, AND I THINK THAT THE COURT

19  SHOULD GIVE HIM THE ABILITY TO DO THAT.

20       AT WORST THE COURT COULD THE COURT COULD PUT HIM ON

21  GPS TRACKING TO ASSURE THAT HE GETS TO TEXAS.  HE COULD

22  SURRENDER HIS PASSPORT AND THERE IS NO WAY HE CAN GO ANYWHERE.

23       THE COURT:  DOES HE HAVE ANYBODY HERE TO CO-SIGN ON A

24  BOND?

25       MR. CONCEPCION:  WE CAN FIND SOMEONE, YOUR HONOR.

1 YES, SIR.  HE HAS HIS GIRLFRIEND AND HE'S GOT OTHER FAMILY

2 MEMBERS IN THE -- IN THE STATE THAT WILL BE WILLING TO HELP

3 HIM.

4           THE COURT:  ALL RIGHT.  THANK YOU.

5           I THANK BOTH SIDES FOR A STRONG PRESENTATION ON BEHALF

6 OF YOUR RESPECTIVE CLIENTS.

7           FIRST, WITH RESPECT TO REMOVAL.  I'M GOING TO FIND

8 CERTAINLY THAT THE GOVERNMENT HAS ESTABLISHED IDENTITY, AND I'M

9 FINDING THAT THERE IS PROBABLE CAUSE TO RAISE SOME ISSUES AND

10 HE MAY HAVE WELL A TRIABLE CASE BUT I'M FINDING THERE IS

11 PROBABLE CAUSE.  AND SO BECAUSE THERE IS PROBABLE CAUSE AND AN

12 IDENTIFICATION OF THE DEFENDANT I'M GOING TO ORDER HIM REMOVED

13 TO TEXAS, THE EASTERN DISTRICT OF TEXAS.

14           WITH RESPECT TO BOND.  THERE IS NO PRESUMPTION.  I

15 DON'T THINK MONEY LAUNDERING IS COVERED BY ANY OF THE SECTIONS

16 WHERE IT WOULD BE STRAIGHT UP RISK OF FLIGHT OR DANGER TO THE

17 COMMUNITY, IT WOULD HAVE TO BE SERIOUS RISK OF FLIGHT.

18           HOWEVER, I'M GOING TO FIND THAT THE GOVERNMENT HAS

19 ESTABLISHED A SERIOUS RISK OF FLIGHT BASED UPON HIS -- I THINK

20 THE TIME THAT HE'S FACING, THE APPARENT DISHONESTY WITH DEALING

21 WITH THE GOVERNMENT AGENCY WITH WHICH HE HAD PREVIOUSLY BEEN

22 WORKING AND AN ACKNOWLEDGMENT THAT HE WAS NO LONGER WORKING

23 WITH THEM AND ALSO HIS TIES TO VENEZUELA.

24           HE DOES HAVE SOME TIES HERE AS WELL.  BUT ACCORDING TO

25 THE PRETRIAL SERVICES HE HAS CITIZENSHIP IN VENEZUELA, AND HIS

```
 1  PARENTS AND TWO SIBLINGS LIVE THERE, AND THE GOVERNMENT'S

 2  PROFFER THAT THERE IS NO EXTRADITION TREATY BETWEEN THEM, AND

 3  HE'S HAD FREQUENT TRAVEL TO VENEZUELA, COLOMBIA AND THE

 4  DOMINICAN REPUBLIC.

 5        SO FOR ALL THOSE REASONS I WILL FIND THAT HE IS A

 6  SERIOUS RISK OF FLIGHT AND I WILL ORDER HIM HELD IN DETENTION

 7  AND I WILL SIGN THE REMOVAL PAPERS TODAY TO ORDER HIM TO GO

 8  BACK TO TEXAS.

 9        ANYTHING ELSE TO COME FORWARD IN THIS CASE,

10  MR. BEHNKE?

11        MR. BEHNKE:  NOT FROM THE GOVERNMENT, YOUR HONOR.

12  THANK YOU.

13        THE COURT:  MR. CONCEPCION?

14        MR. CONCEPCION:  NO, YOUR HONOR.  THANK YOU.

15        THE COURT:  ALL RIGHT.

16        GOOD LUCK TO YOU, MR. YABRUDI.

17

18

19

20

21

22

23

24

25
```

```
 1

 2

 3                        C E R T I F I C A T E

 4

 5

 6  UNITED STATES OF AMERICA

 7  SOUTHERN DISTRICT OF FLORIDA

 8

 9

10        I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED

11  STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO

12  HEREBY CERTIFY THAT THE FOREGOING 50 PAGES CONSTITUTE A TRUE

13  TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN

14  THE CITY OF FORT LAUDERDALE, FLORIDA, IN THE MATTER THEREIN

15  STATED.

16        IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS 5TH

17  DAY OF APRIL 2018.

18

19                              /S/CARL SCHANZLEH
                                CARL SCHANZLEH, RPR-CM
20                              CERTIFIED COURT REPORTER
                                9960 SW 4TH STREET
21                              PLANTATION, FL 33324
                                TELEPHONE 954 424-6723
22

23

24

25
```